DECISION AND JUDGMENT ENTRY
{¶ 1} Sheri B., appellant, appeals a decision from the Lucas County Court of Common Pleas, Juvenile Division, naming John A.L., appellee, as the residential parent and legal custodian of their son. Because we conclude that the decision was not against the manifest weight of the evidence and that no bias existed in either the guardian ad litem ("GAL") report filed on the minor child's behalf or in the magistrate's and trial court's order, we affirm.
 {¶ 2} Sheri and John, unmarried, had a son together in June 1998. They began sharing custody and parenting time with their son when he was approximately one and a half years old, pursuant to a mediated shared parenting plan. The plan dictated that the child was to spend alternate weeks at each parent's home, and attend school in his father's school district. Prior to that time, the boy lived primarily with Sheri. When he was approximately one year old, Sheri began leaving her son at John's house for extended periods, so that the child spent approximately 80 percent to 90 percent of his time at his father's house. Around this same time, John was (and still is) residing with Tonya, his significant other, Tonya's two children, and John's daughter from a previous relationship; the child's half-sister stayed at John's house every other weekend and every other week in the summer. Sheri, John, and other witnesses stated that the purpose of the extended visitation time was to allow the boy to "bond" with his father. After six months of this informal arrangement, John filed for an allocation of parental rights and responsibilities and the shared parenting plan was the mediated result.
 {¶ 3} John joined the military in late 2002, and he was called for service on July 29, 2003, when he left for boot camp training. Both he and his significant other, Tonya, testified that they made Sheri aware of the boot camp training as early as January 2002. Both John and Tonya testified that Sheri had agreed to continue the shared parenting schedule in John's absence, with alternate weeks spent at each home, and their son staying at his father's residence under Tonya's care. The purpose of the agreement was to allow the child to continue to interact with Tonya's children and his half-sister.
 {¶ 4} Friction arose when, once John had left for boot camp, Sheri refused to allow her son to stay at John's home with Tonya. Tonya testified that Sheri would only allow her and the other children to see the boy if they went over to Sheri's house and sat in the driveway for short periods. Tonya testified that Sheri told her she changed her mind because "the court" told her she did not have to let the child visit with non-relatives. While he was away, Sheri enrolled their son in her school district, contrary to the shared parenting plan, which required the child to attend school in John's school district.
 {¶ 5} John returned from boot camp in September 2003. John and Sheri began having communication problems regarding, inter alia, some medical bills for the child. John then filed a motion to show cause, alleging that Sheri had violated and continued to violate the shared parenting plan, and a motion to reallocate parental rights and responsibilities, seeking permanent custody of the child. Sheri also filed a motion for modification.
 {¶ 6} After two days of hearings before the magistrate, in which John, Sheri, Tonya, Richard Adams (Sheri's "significant other"), and the GAL testified, the magistrate issued a decision concluding that a change in circumstances warranted an examination of parental rights and the benefit from changing the child's custody from shared parenting to his father outweighed any harm; and that by a preponderance of the evidence, including the GAL report, it was in the child's best interests to award legal custody to appellee. Specifically, the magistrate found that appellee was in the best position to "protect this child from physical, mental or emotional harm" and that he was in the best position to obey and carry out orders of the court.
 {¶ 7} Appellant presents two assignments of error for review:
 {¶ 8} "FIRST ASSIGNMENT OF ERROR: DOES THE MANIFEST WEIGHT OF THE EVIDENCE SUPPORT THE COURT'S RULING?
 {¶ 9} "SECOND ASSIGNMENT OF ERROR: IN A PRIVATE CUSTODY TRIAL, DID THE COURT ERR IN ACCEPTING A GUARDIAN AD LITEM REPORT THAT LACKED AN IMPORTANT AND BASIC AREA OF INVESTIGATION?"
 {¶ 10} In her second assignment of error, she argues that bias existed in the GAL report; specifically, that the GAL improperly considered the fact that Sheri was residing with Richard Adams, a felon recently released from prison on parole. Because the GAL report was evidence considered by the trial court's order, we will first address appellant's second assignment of error. Appellant argues that the GAL's bias against "ex-convicts" was due in large part to the GAL's failure to investigate Adams' "actual abilities and character." Appellant does not directly allege that the magistrate was biased; rather, she argues that the GAL's bias against Adams "influenced" the outcome of the hearing. The bulk of her argument seems to assert that an appellate court has the "ability to overturn a decision based on the [GAL]'s failure to investigate."
 {¶ 11} "The function of a guardian ad litem or for a representative for the child is to secure for such child a proper defense or an adequate protection of its rights. The ultimate decision in any proceeding is for the judge and not for the representative of the parties * * *." In reHeight (1975), 47 Ohio App.2d 203, 206. A guardian ad litem's duties include investigating one or more such areas and delivering a report and recommendation regarding the child's best interests. In re Baby GirlBaxter (1985), 17 Ohio St.3d 229, 232.
 {¶ 12} The threshold for proving that an alleged bias existed in a magistrate's or judge's decision is high. "The terms `bias' or `prejudice' refer to `a hostile feeling or spirit of ill will on the one hand, or undue friendship or favoritism on the other, toward one of the litigants or his or her attorneys, with a formation of a fixed anticipatory judgment on the part of a judge as distinguished from an open state of mind which will be governed by the law and the facts.' 22 Ohio Jurisprudence 3d (1998) 203, Courts and Judges, Section 126."Mascorro v. Mascorro (June 9, 2000), 2nd Dist. No. 17945. See, also,State ex rel. Pratt v. Weygandt (1956), 164 Ohio St. 463, paragraph four of the syllabus. The same definitions of "bias" apply in our analysis of whether the GAL exhibited bias toward Adams and whether the GAL's report improperly influenced the magistrate.
 {¶ 13} Appellant cites In the matter of: Alexis Seitz, 11th Dist. No. 2002-T-0097, 2003-Ohio-5218, wherein the court considered the appellant's argument that "the guardian ad litem had performed such an inadequate investigation into Alexis' best interests so that the recommendation in her report that appellee be given custody of Alexis lacked support." Appellant urges us to apply the "logic" in Seitz to the instant matter.
 {¶ 14} However, it is not apparent that Seitz represents a rule that an award of custody may be reversed solely on the basis of insufficient investigation on the part of a GAL. The court in Seitz quoted In rePryor (1993), 86 Ohio App.3d 327, 338, which stated, "appellant cites no authority and it is not immediately apparent to us that a custodial disposition of dependent children should even be reversed merely on the basis of arguably ineffective service by the guardian ad litem." Pryor
then proceeded to assume such a rule arguendo, and concluded that the GAL's services were adequate. To the extent Pryor concerned the adjudication and disposition of a dependent child and not a private custody dispute, it is inapposite to the matter at hand. Moreover, Seitz
seems to doubt the validity of such a rule.
 {¶ 15} Be that as it may, as in Seitz, we find that the GAL's investigation — interviews with appellant, appellee, the child, Tonya, family members, friends, the child's school teacher, and appellee's daughter's mother — sufficient to support her recommendations. To buttress her argument that the GAL's bias against ex-convicts improperly influenced the magistrate, appellant points to a lack of evidence that Adams was living with her, and a lack of evidence demonstrating that Adams' was an inappropriate person to have contact with her son. However, the GAL did not firmly or definitely recommend John over Sheri; she listed as a "consideration" that John should be the residential parent if Sheri continued to allow Adams to reside in her home; she actually recommended that time sharing should stay the same, because the child thrived from exposure to both parents and he was used to his schedule. Appellant's suggestion that the GAL's report was unsupported by an inadequate investigation is untenable.
 {¶ 16} We also disagree as to the extent that the GAL's report should have been disregarded due to a bias against ex-convicts. Having reviewed the GAL report, we find no bias against ex-convicts; the GAL report appears balanced and researched. The GAL stated she attempted to contact Adams to interview him, but her attempts were unsuccessful.
 {¶ 17} Although appellant does not explicitly state an allegation of bias against the magistrate or trial court, we find her suggestion of improper influence on the part of the GAL unfounded. "[A] trial court must determine the guardian ad litem's credibility and determine the weight to be given to any report. In the matter of Sydney J. (Sept. 30, 1999), Ottawa App. No. OT-99-026; Kohlman v. Kohlman (Sept. 24, 1993), Ottawa App. No. 92-OT-046. A trial court is not bound by such recommendation. In re Andrew B., 6th Dist. No. L-01-1440, 2002-Ohio-3977, at ¶ 64." Charles H.H. v. Marie S., 6th Dist. No. L-02-1312, 2003-Ohio-3094, ¶ 6. Additionally, the GAL was present at the hearings, cross-examined all the witnesses, testified, and was cross-examined by appellant.
 {¶ 18} Moreover, since the GAL report evidenced no bias, no influence could have been exercised upon the magistrate or trial court. Appellant's second assignment of error is therefore not well-taken.
 {¶ 19} In her first assignment of error, appellant argues that the trial court's decision to grant appellee residential parent status is against the manifest weight of the evidence. In determining the allocation of parental rights and responsibilities for the care of minor children, the trial court is vested with broad discretion. Miller v.Miller (1988), 37 Ohio St.3d 71, 74. Absent an abuse of that discretion a trial court's decision regarding these issues will be upheld. Masters v.Masters (1994), 69 Ohio St.3d 83, 85. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219. An appellate court may not merely substitute its judgment for that of the trial court. See Davis v.Flickinger (1997), 77 Ohio St.3d 415, 416.
 {¶ 20} In any allocation of parental rights and responsibilities, the consideration of the child's best interests is key. R.C. 2151.23(F)(1) provides that the juvenile court shall exercise its jurisdiction in child custody matters in accordance with R.C. 3109.04, which authorizes domestic relations courts to allocate parental rights and responsibilities for the care of minor children. "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child." R.C. 3109.04(E)(1)(a). "Nevertheless, where the issue is the termination of an existing shared parenting decree, R.C. 3109.04(E)(2)(c) provides that the court may do so if shared parenting is not in the best interest of the child. In such an instance, the moving party does not need to demonstrate a change of circumstances." Lynch v. Lynch, 6th Dist. No. H-02-022, 2003-Ohio-1039, ¶ 12. The magistrate concluded that a change in circumstances occurred when appellant became "involved" with Adams. The magistrate also found that the benefit of changing from the shared parenting plan to appellee's sole custody outweighed the harm that such a change may cause, fulfilling the requirement of R.C. 3109.04(E)(1)(a)(iii).
 {¶ 21} Appellant contests the magistrate's conclusion that a change in circumstances occurred in that Adams' "relationship with the child was ongoing and was not a new circumstance." For instance, Adams testified that he wrote the child letters while he was incarcerated and spoke to the child on the phone. Although a finding that a change in circumstances was not necessary, we are not persuaded by this argument; although appellant testified otherwise, the GAL reported that the child and appellant's friends told her that Adams was staying at appellant's house. However, appellant obliquely overlooks the major fact that Adams was released from prison and began spending a considerable amount of time with the child; moreover, conflicting testimony was presented that indicated that he was residing with her and the child. Thus, we find no abuse of discretion in the conclusion that a change in circumstances occurred when appellant chose to allow Adams to be paroled to her home and questions arose as to whether Adams was residing with appellant and the child. See Tener v. Tener-Tucker, 12th Dist. No. CA2004-05-061, 2005-Ohio-3892, at ¶ 20, noting that fluctuating living arrangements and an uncertain marital relationship constituted a change in circumstances.
 {¶ 22} In considering whether a reallocation of parental rights serves the child's best interests, the court examines factors pursuant to R.C.3109.04(F)(1)-(a)-(j) and R.C. 3109.04(F)(2)(a)-(e). Appellant argues that the evidence does not support two of the court's conclusions of law: that appellee was in the best position to protect the child from physical, mental or emotional harm, and that appellee was in the best position to obey and carry out the court's orders. These conclusions support a determination that terminating the shared parenting plan was in the child's best interests, and we review those determinations for an abuse of discretion.
 {¶ 23} In support, appellant characterized appellee as a "strict disciplinarian [who] did not have a good grasp of child development." Conflicting testimony was presented as to whether appellee had struck the child at age two for failing to zip his coat, and conflicting testimony as to an incident where, appellant alleges, appellee spanked the child for bedwetting. Both parents and Tonya testified to difficulties in communication; appellant argues that the testimony showed that appellee was more to blame for those difficulties. Appellant admits, however, that she did not release her son to Tonya or appellee's family while he was in boot camp; she asserted that this was upon her attorney's advice and that she was not opposed to the child visiting. She also admits that she unilaterally enrolled her son in her school district, but asserts that this was due to her understanding of the mediated parenting agreement, whereby appellee had promised at the time to move to the Sylvania school district, and due to appellee's absence when the decision to enroll had to be made.
 {¶ 24} John's military service was no longer in issue, since after his initial stint in boot camp, he was medically discharged; he testified that he has no continuing obligations to serve and stood no chance of being recalled. John also testified that, in his opinion, his household presented a more stable environment for his son due to the number of people moving in and out of appellant's home over the years. He also testified that, even if appellant was not in a relationship with Adams, he would still feel that his household was more stable. John and Tonya both voluntarily attended and satisfactorily completed a parenting class; both testified that it helped them understand the importance of communication with appellant. Both also testified that they understand the importance, regardless of the outcome, of the child maintaining a relationship with his mother, and the importance of fostering that relationship through visitation and other contact. John testified that he had never talked to Adams about his [John's] son.
 {¶ 25} Adams testified and stated that he was incarcerated for aggravated drug trafficking when the parties' son was born, but that he had a relationship with appellant before beginning his sentence. While incarcerated, he maintained contact with appellant through letters and phone calls. He presented evidence that he had successfully completed a drug rehabilitation program while in prison; evidence of his teaching accomplishments in various prison rehabilitation programs; and evidence that he completed his GED. While incarcerated, Adams also participated in a program where he would audio tape himself reading children's book aloud; he would mail them to appellant to give to the child; Adams would also send appellant and the child cards for various holidays, and had talked to the child by telephone from prison on several occasions. Adams also acknowledged that he has an eight-year-old daughter, who resides with her grandparents; Adams stated that he had attempted to regain custody of her, but could not because, among other reasons, he had not yet completed parenting classes. He stated that he did not live with appellant, but admitted that he gave his parole officer appellant's address and represented that it was his own address. He also stated that he "eventually" obtained his own apartment. On cross-examination, however, he admitted that he had lived with appellant for "a month and a half, two months" beginning when he was released in November 2003. Adams did not know why, when asked, the child was still telling appellee and the GAL that Adams was still living at appellant's house.
 {¶ 26} Sheri testified that John had initiated discussions about shared parenting, which ultimately led to the mediated shared parenting agreement. Although the relationship under the parenting plan was fine for a while, communication began to break down, and in July 2001, she filed for a change of custody; but she did not pursue that motion because both parties made attempts to remedy the situation. She also testified that she receives Social Security for a disability, and that she only works one day a week, unlike John and Tonya, who both work full-time. Sheri testified that John would frequently call her names and "cuss" at her on the telephone; because of the poor communication and the greater amount of time she has to spend with the child and help with school, she feels that her residence would be better for the child. When questioned regarding Adams, Sheri testified at first that Adams had never lived at her house at all (contrary to Adams' testimony); she then admitted in response to the GAL's questioning that Adams had been paroled to her home, but that it was not a "permanent situation." She also represented that she had no reservations about Adams' involvement with the child.
 {¶ 27} The GAL testified that she had talked to the GAL who was working with Adams and his other daughter, in completion of a reunification case plan, and she was advised that Adams was making excellent progress and that his continuing drug tests were consistently negative. She stated that she was concerned that appellant had not been truthful about her living arrangements, and that Adams did not have much experience with children. She was more concerned with what amounted to, in her opinion, poor choices made by appellant with respect to Adams — and past boyfriends — rather than Adams himself. She ultimately recommended that the (shared) parenting plan that was in place works, and that the amount of time the child shared with both parents stay the same. The GAL also testified that Tonya and John were to have another child soon, that the parties' son was very excited about the new baby, and that he was very close to Tonya's other children in his father's household.
 {¶ 28} Conflicts in testimony, especially in the area of custodial rights, are properly determined by the trier of facts and we pay great deference to such determinations. The manifest weight standard of review "rests on the premise that the trial judge is in the best position to determine the credibility of witnesses because he or she is able to observe their demeanor, gestures and attitude. * * *. This is especially true in a child custody case, since there may be much that is evident in the parties' demeanor and attitude that does not translate well to the record." Blaker v. Wilhelm, 6th Dist. No. WD-04-003, 2005-Ohio-317, ¶ 10, citing In re LS, 152 Ohio App.3d 500, 2003-Ohio-2045, at ¶ 12. "The rule is founded on the more accurate perceptions of a judge who hears and sees the parties testify, and who can make personal, intimate observations about the children, their parents and the relationships between them. We acknowledge that the trial court has discretion in resolving difficult questions about a child's relationship to his or her parents during the fluid, everchanging years of growing up." In re Bibb
(1980), 70 Ohio App.2d 117, 121.
 {¶ 29} Contrary to appellant's urgings, we find that the magistrate and trial court did not abuse their discretion in resolving these conflicts in testimony; the order's resolution of these factual disputes supported an award of custody to appellant and secured the child's best interests, and was not against the manifest weight of the evidence.
 {¶ 30} Upon review of the entire record, we find appellant's first assignment of error not well-taken. For the foregoing reasons, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Pietrykowski, J., Singer, P.J., Skow, J. concur.