[Cite as *In re A.K.*, 2020-Ohio-4700.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
OTTAWA COUNTY

In re A.K.

Court of Appeals No. OT-20-001

Trial Court No. 2018-JUV-307

DECISION AND JUDGMENT

Decided: September 30, 2020

* * * * *

Danielle C. Kulik, for appellant C.F.

Adam H. Houser, for appellant D.K.

James J. VanEerten, Ottawa County Prosecuting Attorney, and
Blake W. Skilliter, Assistant Prosecuting Attorney, for appellee.

* * * * *

**ZMUDA, P.J.**

## I. Introduction

{¶ 1} This matter is before the court on appeal of the January 10, 2020 decision of

the Ottawa County Court of Common Pleas, Juvenile Division, terminating the parental

rights and responsibilities of D.K., the legal father of A.K., and granting permanent

custody of A.K. to the Ottawa County Department of Job and Family Services.  For the reasons that follow, we affirm.

## II.  Facts and Procedural Background

{¶ 2} On June 6, 2018, A.K. was born to F-K.R. (Mother).  At the time, Mother was being held at the Ottawa County Detention Facility and granted a furlough to the hospital to give birth.  Appellant, D.K. (Father), executed an acknowledgment of paternity with knowledge that he was not likely the biological father of A.K.  Subsequent genetic testing excluded him as A.K.'s biological father and Father did not rescind the acknowledgment of paternity.  The juvenile court determined Father to be the legal father of A.K.

{¶ 3} Mother was supposed to return to the detention facility upon her release from the hospital.  However, within hours of giving birth, Mother left the hospital against medical advice so that she and Father could file an affidavit with the court to grant custody of A.K. to appellant, C.F., a family friend.  The parents realized they lacked the ability to care for A.K., as Mother was due to return to custody, and Father was a registered sex offender on parole, with a court order preventing his contact with children.

{¶ 4} On June 8, 2018, appellee, the Ottawa County Department of Job and Family Services (the Agency) received a report that A.K. had been born and was testing high on the neonatal abstinence scale, requiring treatment for symptoms of drug

2.

withdrawal.[1]  That same day, the juvenile court awarded emergency temporary custody of A.K. to the Agency.  A.K. remained in the hospital's care until her release to the care of the Agency.

{¶ 5} Agency caseworkers inquired of Mother and Father as to possible placement for A.K., and they indicated a preference for C.F.  They were also adamant that A.K. not be placed with Father's sister, A.C.  After investigation, the Agency determined that C.F. would not be an appropriate caregiver based on C.F.'s prior children services reports and her previous uncooperative attitude with the Agency.  Instead, after a shelter care hearing, the Agency placed A.K. with a certified foster parent.

{¶ 6} On August 7, 2018, the juvenile court adjudicated A.K. a dependent child, with Mother and Father admitting the dependency allegations in the complaint.  Both C.F. and A.C. expressed interest in caring for A.K., but after a November 8, 2018 dispositional hearing, the juvenile court approved the agreement of Father and Mother to continue A.K.'s placement with her foster mother and the Agency while Mother and Father each completed a case plan with the goal of reunification.

{¶ 7} On January 17, 2019, the juvenile court held a review hearing, and custody was continued with the Agency.

---

[1] In mid-May 2018, Mother reported to the adult probation department for drug screening and tested positive for suboxone.  A.K.'s meconium drug screens, however, were negative.

3.

{¶ 8} On February 6, 2019, A.C. filed a petition for legal custody of A.K. On February 14, 2019, C.F. filed a motion to intervene and motion for legal custody of A.K. After a pretrial hearing in March 2019, the juvenile court continued custody with the Agency without addressing the petition or motions.[2]

{¶ 9} Mother completed some of her case plan objectives while in jail, and once released from jail, she continued with her case plan and began visitations with A.K. at the Village House in Fremont, Ohio.

{¶ 10} Father completed his initial assessments as part of his case plan but failed to complete any of the recommended follow-up and failed to complete parenting or budgeting classes. Also, Father either failed to be present for a home visit, or refused home visits when visited by the Agency caseworker. Because of Father's status as a registered sex offender, he received no visitation with A.K. After Father failed to complete his case plan and was sentenced to a prison term of five years and ten months, he was removed from case plan services at Mother's request.

{¶ 11} On April 19, 2019, Mother died unexpectedly. Days later, on April 26, C.F. filed a second motion seeking custody. On May 3, 2019, after learning of Mother's

---

[2] Both A.C. and C.F. filed motions and affidavits after the matter had been pending six months, and after A.K. was placed with her foster family. Pursuant to R.C. 2151.353(A)(3) temporary custody may be granted to any person requesting legal custody where a party files a motion or complaint designating that person "prior to the dispositional hearing."

4.

death, the Agency filed its motion for permanent custody. On June 4, 2019, C.F. filed a complaint for parental rights.

{¶ 12} The juvenile court held trial on the motions of A.C. and C.F. for legal custody, and on the motion for termination of parental rights and permanent custody of the Agency on August 9, October 11, November 15, November 25, and December 20, 2019. Father appeared with appointed counsel, C.F. appeared with retained counsel, and A.C. appeared pro se.

{¶ 13} On the first day of hearing, Father testified and expressed a desire for his sister, A.C., to have custody of A.K., while also indicating a desire that C.F. be considered as an alternative to foster care. Up until this testimony, Father had not expressed his change of heart regarding his sister to the Agency, the GAL, or the CASA. At the end of hearing on August 9, the juvenile court continued the proceedings for two months to permit the GAL and the CASA to investigate A.C. for possible placement, based on this new information.

{¶ 14} Over the course of the five-day trial, the juvenile court heard testimony from numerous witnesses, including the Agency's caseworker, Father, C.F., A.C., A.K.'s foster mother, and the CASA and GAL assigned to A.K. There was extensive testimony concerning A.K.'s placement with her foster mother, including A.K.'s health issues, her gluten-free diet, and her bonding with her foster family. There was also extensive testimony concerning C.F.'s own special-needs children, her own health issues, and

C.F.'s past contacts with Children's Services concerning allegations of neglect and truancy for her own children.

{¶ 15} Both Father and C.F. challenged the Agency and GAL testimony, pointing out inconsistencies in the caseworker's testimony regarding C.F.'s home visit, and arguing a conflict of interest for the GAL, who had previously represented C.F. and her husband in a separate truancy proceeding for their children but had no recollection of any prior contact.

{¶ 16} After considering the testimony and evidence, including the GAL reports entered without objection by Father and with only the objection regarding the conflict by C.F., the juvenile court terminated Father's parental rights and found that permanent placement with the Agency was in the best interests of A.K. Both Father and C.F. filed a timely appeal of this judgment.

### III. Assignments of Error

{¶ 17} Both Father and C.F. appeal the juvenile court's determination. Father identifies the following as assignments of error for our review:

1. The Trial's Court [sic.] Decision was Against the Manifest Weight of Evidence as It Was Not in the Best Interest Of the Child to Grant Permanent Custody of the Child to Ottawa County Jobs [sic.] and Family Services and to Denied [sic.] the Legal Custody Motions of Ms. [C.F.] or [A.C.] as Ottawa County Jobs [sic.] and Family Service Failed to Follow Any Kinship Placement of the Child.

6.

2. Ottawa County Jobs [sic.] and Family Services Violated Father's Constitutional Due Process Rights When It Continue [sic.] to Make a Difference Between Legal Father and Biological Father Throughout the Case.

3. The Trial Court Abused Its Discretion When It Failed To Strike The Guardian Ad Litem Testimony As The GAL Failed To Adequately Discharge Her Duty And Failed To Conduct An Independent Investigation.

4. The Trial Court Considered Facts Not in Evidence When It Included The Facts That The Child Had A Gluten Allergy And Was Improper For The CASA And The GAL to Rely On Those Facts In Their Reports.

{¶ 18} C.F. claims she was entitled to be treated as an individual acting in loco parentis from the beginning of A.K.'s case, and asserts the following error for our review:

1. THE COURT ERRED IN NOT STRIKING THE GUARDIAN AD LITEM'S REPORT AND FOR RELYING ON THE 'FACTS' FROM THAT REPORT AFTER GAL DID NOT FAITHFULLY DISCHARGE HER DUTIES.

2. THE COURT ERRED IN NOT STRIKING THE GAL'S TESTIMONY, REPORTS, AND RECOMMENDATIONS WHEN THE GAL VIOLATED THE CODE OF JUDICIAL CONDUCT AND/OR THE RULES OF PROFESSIONAL CONDUCT.

3. THE COURT AND AGENCY ERRED IN FINDING [C.F.] UNSUITABLE.

4. THE COURT ERRED IN DETERMINING PERMANENT CUSTODY WAS IN A.K.'S BEST INTEREST.

5. THE COURT'S DECISION WAS CONTRARY TO THE MANIFEST EVIDENCE.

6. DUE PROCESS WAS VIOLATED WITH THE CUMULATIVE ERRORS AT TRIAL.

{¶ 19} We address the assignments of error out of order for ease of discussion. Furthermore, many issues raised by Father and C.F. are aligned, and we shall address these assignments of error together where possible.

## IV. Analysis

{¶ 20} While not raised by the Agency, we first address the issue of C.F.'s standing. C.F. never had custody of A.K. and was not considered a party in the proceedings. C.F. did, however, file a motion to intervene and motions for legal custody. We have previously held that the filing of a motion to intervene and motion for custody pursuant to R.C. 2151.353(A)(3) "gives rise to another exception to the general rule that a 'party' status is necessary to appeal." Therefore, to the extent that C.F. challenges issues related to the juvenile court's judgment denying her motion for custody, we consider her assignments of error. *See In re A.B.*, 2018-Ohio-4206, 114 N.E.3d 421, ¶ 9 (6th Dist.).

8.

{¶ 21} The juvenile court terminated Father's parental rights and awarded permanent custody of A.K. to the Agency. Neither Father nor C.F. challenge the juvenile court's determination regarding Father's inability to care for A.K., considering his lengthy prison term and his acknowledgment that both he and Mother intended to give A.K. to C.F. at birth because neither was able to care for her. Instead, both challenge the juvenile court's determination that awarding permanent custody to the Agency, rather than either C.F. or A.C., as not in the best interests of A.K.

{¶ 22} "Ohio courts have long held that a parent who is a suitable person has a paramount right to the custody of his or her child." *In re Kayla H.*, 175 Ohio App.3d 192, 2007-Ohio-6128, 886 N.E.2d 235, ¶ 31 (6th Dist.), citing *Clark v. Bayer*, 32 Ohio St. 299, 310 (1877); *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990). This right is a basic and fundamental civil right, and the termination of parental rights "is the family law equivalent of the death penalty in a criminal case." *In re Kayla H.* at ¶ 31, quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991)

{¶ 23} Because of the rights involved, termination requires the provision of "every procedural and substantive protection the law allows" to the parents. *In re Kayla H.* at ¶ 31, quoting *In re Smith* at 16. A parent's rights, however, "are always subject to the ultimate welfare of the child." *In re Nicholas P.*, 169 Ohio App.3d 570, 2006-Ohio-6213, 863 N.E.2d 1102, ¶ 17 (6th Dist.), citing *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

9.

**Parental Rights**

{¶ 24} As an initial matter, we note that both Father and C.F. argue their parental rights were not fully recognized within the juvenile court proceedings. In his second assignment of error, Father contends that the Agency violated his constitutional rights by differentiating between "legal father" and "biological father" throughout the case. C.F. argues she was entitled to be treated as a person in loco parentis and provided constitutional safeguards throughout the case, including appointed counsel.

{¶ 25} It is undisputed that Father is the legal father of A.K., and Mother never identified A.K.'s biological father. The juvenile court recognized Father as legal father and denied the Agency's motion seeking to strike Father's affidavit acknowledging paternity. The juvenile court also ensured that Father had representation at every stage of the proceedings. The Agency provided case plan services to Father, which Father did not complete. Father's assignment of error, however, focuses on a perceived bias by the Agency, illustrated by efforts for Mother's aunt to meet with the foster mother about potential visitation with A.K.

{¶ 26} While the aunt did meet with A.K.'s foster mother, within months of the August trial date, she did not pursue custody of A.K. According to testimony by the caseworker:

> She met with the foster mom. She did not want to meet with [A.K.] at the time because she did not want to disrupt anything. She didn't want her family, her husband and children to meet with [A.K.] just in case it

didn't move forward. I left it in her hands to contact me, should she want

to move forward for placement, and she stated she did not wish to do so, so

we just left it at that.

The caseworker indicated that the aunt felt "comfortable with the placement of [A.K.]"

with her foster parents. Unlike A.C. and C.F., A.K.'s maternal aunt did not seek custody

and was never considered for custody.

{¶ 27} Father identifies no other issue of potential discriminatory treatment, based

on his status as legal (but not biological) parent. Upon review of the record, we find no

such bias, as Father received all required due process protections in the proceedings.

Father's second assignment of error, therefore, is not well-taken.

{¶ 28} While not raised as a separate assignment of error, C.F. also argues a

violation of her parental rights as a person acting in loco parentis based on the failure of

the juvenile court to appoint counsel to represent her in the proceedings. "A person in

loco parentis assumes the same duties as a guardian or custodian, although not through a

legal proceeding." *State ex rel. Asberry v. Payne*, 82 Ohio St.3d 44, 49, 693 N.E.2d 794

(1998), fn. 2, citing *State v. Noggle*, 67 Ohio St.3d 31, 33, 615 N.E.2d 1040 (1993);

*Evans v. Ohio State Univ.*, 112 Ohio App.3d 724, 737, 680 N.E.2d 161 (10th Dist.1996).

{¶ 29} The record clearly reflects that C.F. never had custody of A.K., as A.K.

went from the hospital's care to the Agency. At most, C.F. cared for Mother prior to

A.K.'s birth, was present for A.K.'s birth, and visited with A.K. at the hospital up until

11.

the emergency shelter care hearing when A.K. was 2 days old.[3]  C.F.'s argument, moreover, is focused on her desire to parent A.K. and her preparations for parenthood, prevented by the Agency's actions.  Accordingly, with no evidence demonstrating C.F. ever had custody of A.K. or acted as parent to A.K., we find no error in the juvenile court failing to appoint counsel for C.F., as a person acting in loco parentis.  *See, e.g., In re Denisha Michelle T.*, 6th Dist. Lucas No. L-04-1236, 2005-Ohio-1032, ¶ 9 (grandmother never had custody of child, so no entitlement to appointed counsel).

## Evidentiary Challenges

{¶ 30} We next address Father's and C.F.'s challenge to the testimony and reports of the GAL and the CASA.  In Father's third assignment of error, he argues the trial court abused its discretion in failing to strike the GAL's testimony, which he characterizes as the product of an inadequate investigation.  Father also argues, in his fourth assignment of error, that evidence of a gluten allergy referenced by the CASA and the GAL lacked proper support in the record and should have been excluded as evidence.  C.F. also asserts a challenge to the testimony and reports of the GAL in her first and second assignments of error, arguing the GAL failed to properly discharge her duties and violated ethical rules, referencing a potential conflict of interest.

---

[3] C.F. did file a motion to intervene along with her motion for custody.  The record contains no indication of the juvenile court's ruling on the motion, but during the trial, the juvenile court emphasized that C.F. was not a party.

12.

{¶ 31} A GAL's purpose is to protect the child's interests and rights. *John A.L. v. Sheri B.*, 6th Dist. Lucas No. L-04-1250, 2005-Ohio-5357, ¶ 11, citing *In re Height*, 47 Ohio App.2d 203, 206, 353 N.E.2d 887 (3d Dist.1975). The duties of a GAL include investigating and delivering a report and recommendation regarding the best interests of the child, to assist the juvenile court in its determination of the child's best interests. *Id.*, citing *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232, 479 N.E.2d 257 (1985); *see also In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 14, quoting Sup.R. 48(B)(1) and citing R.C. 2151.281(B).

{¶ 32} The GAL's responsibilities are provided at R.C. 2151.281(I), requiring "investigation, mediation, monitoring court proceedings, and monitoring the services provided the child by the [agency] that has temporary or permanent custody of the child[.]" Pertinent to this appeal, Sup.R. 48(D)(13), includes the following duties:

> A guardian ad litem shall make reasonable efforts to become informed about the facts of the case and to contact all parties. In order to provide the court with relevant information and an informed recommendation as to the child's best interest, a guardian ad litem shall, at a minimum, do the following, unless impracticable or inadvisable because of the age of the child or the specific circumstances of a particular case:
>
> (a) Meet with and interview the child and observe the child with each parent, foster parent, guardian or physical custodian and conduct at

13.

least one interview with the child where none of these individuals is present;

(b) Visit the child at his or her residence in accordance with any standards established by the court in which the guardian ad litem is appointed;

(c) Ascertain the wishes of the child;

(d) Meet with and interview the parties, foster parents and other significant individuals who may have relevant knowledge regarding the issues of the case;

(e) Review pleadings and other relevant court documents in the case in which the guardian ad litem is appointed;

(f) Review criminal, civil, educational and administrative records pertaining to the child and, if appropriate, to the child's family or to other parties in the case;

(g) Interview school personnel, medical and mental health providers, child protective services workers and relevant court personnel and obtain copies of relevant records;

(h) Recommend that the court order psychological evaluations, mental health and/or substance abuse assessments, or other evaluations or tests of the parties as the guardian ad litem deems necessary or helpful to the court; and

(i) Perform any other investigation necessary to make an informed recommendation regarding the best interest of the child.

{¶ 33} Initially, Father indicated no objection to admission of the GAL reports at the close of the GAL's direct testimony. After cross-examination of the GAL, however, Father moved to strike the testimony and reports, arguing the GAL failed to satisfy her duty of investigation under Sup.R. 48(D) by failing to speak with Father or fully investigate either of Father's choices to take custody of A.K. On appeal, Father argues that the GAL was "nothing more than a rubber stamp for the agency." Both Father and C.F. contend the GAL was biased against alternatives to placement with the Agency and failed to consider either A.C. or C.F. from the beginning of the case. Much of this argument, by both Father and C.F., is an attempt to re-write the history in this case.

{¶ 34} At trial, the GAL testified that she was assigned to A.K.'s case from the beginning and began her investigation by reviewing the filings in the case, including the complaint in dependency and the custody petitions and motions. Mother and Father admitted to the dependency allegations and agreed to continued placement with the Agency and A.K.'s foster mother at the disposition hearing in November 2018.

{¶ 35} The GAL spoke with A.K.'s foster mother mostly by phone and conducted one home visit. The GAL did not speak with Father's sister prior to the trial because both Father and Mother expressed strong opposition to any placement with A.C. Additionally, Father was never considered for placement, as the terms of his parole barred him from

having any contact with a child, and he was later sentenced to a lengthy prison term, unrelated to matters in this case.

{¶ 36} As to C.F., the GAL spoke with her early in the case and expressed concerns about placement with C.F. to A.K.'s caseworker, who shared those concerns regarding C.F. based on her past interactions with the Agency concerning her own children. Because of these concerns and because the Agency was not considering a change of placement for A.K., the GAL did not visit C.F.'s home. During the pendency of the case, Mother was working toward reunification with A.K. up until her untimely death in April 2019.

{¶ 37} On the first day of trial, Father changed his mind and asked the juvenile court to consider his sister, A.C., for custody of A.K. The juvenile court continued the matter for two months to permit investigation of A.C. as a potential placement for A.K. The GAL testified after meeting with A.C., and testified regarding her investigation of both C.F. and A.C.

{¶ 38} The juvenile court denied the motion to strike the GAL's testimony and reports, an evidentiary ruling. Accordingly, we will not reverse, based on the admission of this evidence, absent an abuse of discretion. *Matter of K.W.*, 2018-Ohio-1933, 111 N.E.3d 368, ¶ 97 (4th Dist.), citing *Corey v. Cory*, 2d Dist. Greene No. 2013-CA-73, 2014-Ohio-3258, ¶ 9; *Smith v. Boyd*, 3d Dist. Seneca No. 13-05-49, 2006-Ohio-6931, ¶ 34 (additional citations omitted.) Whether the GAL satisfied all requirements under

16.

Sup.R. 48(D), moreover, is not dispositive, as the rule provides a guideline for conduct, and creates no substantive rights. *In re E.S., Z.S.*, 6th Dist. Ottawa Nos. OT-14-008, OT-14-009, OT-14-011, OT-14-012, 2014-Ohio-3067, ¶ 61.

{¶ 39} In arguing that the GAL's investigation fell far below the minimum standards required, Father and C.F. rely on the authority of *Nolan v. Nolan*, 4th Dist. Scioto No. 11 CA3444, 2012-Ohio-3736. *Nolan* concerned termination of a shared parenting plan in a custody dispute. We previously addressed this case and found that "the *Nolan* court expressly limited its holding to the facts of that case." *In re E.S., Z.S.* at ¶ 64. Furthermore, based on the record, the GAL did complete many of the duties listed at Sup.R. 48(D)(13), even if she could have conducted a more extensive investigation. The GAL interviewed A.C., C.F., and A.K.'s foster mother, visited the foster home, visited A.C.'s home, and reviewed the court documents. A.K.'s medical issues were already documented by the hospital where she was born, and were the reason the Agency opened a case. A meeting with or interview of A.K. was not feasible, based on A.K.'s age, and the testimony indicated A.K. was never tested for gluten sensitivity, but was doing well on her gluten-free diet.

{¶ 40} Considering the testimony, we do not find that this is a case where the GAL's investigation fell so far below the minimum standards that her testimony and report should have been disregarded. Therefore, we find Father's third assignment of error and C.F.'s first assignment of error not well-taken.

17.

{¶ 41} Father next challenges whether A.K.'s undocumented gluten sensitivity should have been considered as evidence based on reports by the CASA, and argues the juvenile court improperly relied on this sensitivity as established fact. The juvenile court noted the following in its findings of fact regarding A.K.'s gluten-free diet:

Due to some of the child's behaviors, [foster mother] placed the child on a gluten-free diet. Many of the symptoms have now resolved.

The family goes to great lengths to assure that A.K. does not have any gluten contamination.

{¶ 42} In its conclusions of law, the juvenile court referenced A.K.'s "special needs" as a factor considered in determining the best interests of A.K. In addition to testimony regarding dietary adjustments to address behavioral issues, the record demonstrated A.K. was born testing high on the neonatal abstinence scale requiring treatment for withdrawal symptoms and had heart issues. Father cites to nothing within the juvenile court's decision, moreover, indicating consideration of a non-existent, medical diagnosis of a gluten allergy as the sole factor demonstrating "special needs." Therefore, considering the entirety of the record, we find Father's fourth assignment of error not well-taken.

{¶ 43} In C.F.'s second assignment of error, she argues the juvenile court erred in failing to strike the GAL's testimony, reports, and recommendations because the GAL "violated the code of judicial conduct and/or the rules of professional conduct." On the second day of trial, more than a year into the case, C.F. raised the issue of an alleged

18.

conflict of interest, indicating the GAL had represented C.F. or her husband in a truancy matter for their own children. On appeal, C.F. adds allegations regarding ethical violations, based on references in the GAL's testimony to her past interactions with Mother's family "in the legal system" and her acquaintance with Father's family, comprised of encounters around town or at meetings during her time as solicitor of Rocky Ridge.

{¶ 44} Despite the GAL's participation in the case from the beginning, and the GAL's interactions with C.F. on the phone and at each court date, C.F. did not raise the issue of a conflict until October 2019, more than a year after this case began. Prior to the GAL's testimony, C.F.'s counsel raised the following concern, joined by Father:

> Your Honor, as a matter of ethical duty and pointing out a potential conflict, the State, as we previously noted, indicated that they would be introducing at some point witnesses, although not today, regarding alleged truancy and my client's role in that process.
>
> With that in mind, my client and I briefly had an opportunity to discuss the State's witness list yesterday and this morning I was given a judgment entry from the Common Pleas Court Juvenile Division, this court, dated February 9th, 2017 in which it was indicated that in a proceeding involving that allegation my client [C.F.] was represented by Attorney Sarah Nation who is currently the guardian ad litem in this case.
>
> * * *

And while the State may choose to not introduce this particular judgment entry or this particular result of this particular case in court, my client reserves the ability to do so by testifying about what she was accused of, what the potential results were, and what remedial action, if any, was taken because if she needs to do that she should maintain the right to do that.

I am certainly not indicating that I believe that anybody has done anything intentionally unethical here, but at the same time the person who is making a recommendation to the Court on the best interests of the child apparently represented my client on a proceeding that the State has indicated, according to the prosecutor, feels that may be relevant to the finder of facts' determination in this matter.

So for that reason, I am not trying to needlessly complicate things, but in furtherance of my job, I would probably have to ask that the guardian ad litem's recommendations be excluded, Your Honor.

{¶ 45} In response to allegations of a conflict and bias, the GAL indicated to the juvenile court that she had no recollection of the 2017 case and "the truancy issue was not in any of my reports and it is not something I considered in not recommending [C.F.] for custody." The prosecutor, moreover, noted that C.F. "has been here for quite some time since day one. She knows Ms. Nation. She has never said anything about a conflict."

{¶ 46} While we find authority to support disqualification and removal of a GAL due to a conflict of interest, neither Father nor C.F. sought to disqualify the GAL. *See, e.g., Branum v. Branum*, 6th Dist. Ottawa No. OT-10-018, 2011-Ohio-361, ¶ 53 (finding no plain error where appellant could have moved to disqualify the GAL but failed to do so). Instead, Father and C.F. sought to exclude the GAL's recommendations entirely, leaving A.K. without any GAL recommendations regarding her best interests. Despite allegations of bias, however, the GAL's recommendations appear balanced and supported by the facts. Both Father and C.F. also had the opportunity to cross-examine the GAL regarding her investigation and her findings. Ultimately, the juvenile court determines the credibility and weight to give to the report and is not bound by the GAL's recommendations. *John A.L. v. Sheri B.*, 6th Dist. Lucas No. 2005-Ohio-5357, ¶ 17, quoting *Charles H.H. v. Marie S.*, 6th Dist. No. L-02-1312, 2003-Ohio-3094, ¶ 6. Accordingly, we find no error in admitting the GAL's testimony and reports based on a conflict of interest.

{¶ 47} In addition to this alleged conflict of interest, C.F. argues judicial and professional ethics violations by the GAL that have no support in the record and appear irrelevant to the issues in the case. First, C.F. claims that the GAL used "information gained in her judicial capacity [as a former magistrate] to rule out other family members." In support, C.F. references testimony by the GAL in response to a hypothetical question regarding the importance of considering other family members who might be willing to seek custody of A.K. In response, the GAL indicated she knew that

A.K.'s maternal grandmother and uncle had been "in trouble" or had "a case that was pending" during the time she worked "for the judge in 2000 to 2002." C.F. also claimed that the GAL used knowledge obtained in her position as solicitor for Rocky Ridge to "inform her acts," and failed to obtain C.F.'s informed consent to waive any conflict in serving as GAL for A.K., violations of the professional ethics rules governing attorneys. The GAL knew of some of Father's relatives, based on chance encounters in the community, and had no memory of serving as C.F.'s attorney prior to her appointment as GAL.

{¶ 48} We find C.F.'s claims of judicial and professional ethics code violations highly speculative and unsupported by the record. We further note that issues of attorney misconduct are not properly raised in this appeal, as the Ohio Supreme Court has jurisdiction to address matters of misconduct, related to the practice of law. *See* Ohio Constitution Article IV, Section 2(B)(1)(g). Finally, we addressed the perceived conflict of interest, and found no abuse of discretion in failing to strike the GAL's recommendations as remedy. We therefore find C.F.'s second assignment of error not well-taken.

### Permanent Custody

{¶ 49} We next address the challenges to the juvenile court's award of permanent custody to the Agency, asserted in Father's first assignment of error and in C.F.'s third, fourth, and fifth assignments of error. Father argues that the juvenile court's decision, choosing the Agency over the motions of C.F. and A.C. and awarding permanent custody

22.

to the Agency was against the manifest weight of the evidence and not in the best interest of A.K. In her collective assignments of error, C.F. challenges the decision arguing the juvenile court erred in finding her unsuitable and erred in determining an award of permanent custody to the Agency was in A.K.'s best interest, and C.F. argues the juvenile court's decision was against the manifest weight of the evidence.

{¶ 50} We review the juvenile court's award of permanent custody for an abuse of discretion. *In re A.B.*, 2018-Ohio-4206, 114 N.E.3d 421, ¶ 12 (6th Dist.), citing *In re K.Q.*, 11th Dist. Ashtabula No. 2017-A-0060, 2018-Ohio-906, ¶ 14; *In re B.H., P.H.*, 6th Dist. Lucas Nos. L-17-1126, L-17-1127, 2018-Ohio-1238, ¶ 28-29. Motions for legal custody by nonparents are also considered according to the "best interests" factors of R.C. 2151.414(D) applicable to permanent custody awards, and will not be reversed unless they lack support by a preponderance of the evidence. *In re A.B.*, 2018-Ohio-4206 at ¶ 11.

{¶ 51} A motion for permanent custody is governed by R.C. 2151.414, which "sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 22, quoting *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9. Before terminating parental rights and awarding permanent custody to a children services agency, a juvenile court must find clear and convincing evidence satisfying both portions of the permanent custody test set forth in R.C. 2151.414. *In re Katrina T.*, 6th Dist. Sandusky No. S-03-024, 2004-Ohio-3164,

¶ 13. Clear and convincing evidence is defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 52} The two-part test of R.C. 2151.414 requires the juvenile court to find (1) that child cannot be placed with either parent within a reasonable time, or the child is abandoned, orphaned, or has been in temporary custody of the Agency for at least 12 months of a consecutive 22-month period as provided by R.C.2151.414(B), and (2) that the grant of permanent custody to the agency is in the best interest of the child, applying the factors under R.C. 2151.414(D). *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 33-36, 56.

{¶ 53} The juvenile court made the following findings regarding A.K.'s placement with her parents, as required by R.C. 2151.414(B)(1)(a)-(d):

> [Mother] passed away on April 19, 2019. [Father] is incarcerated with the Ohio Department of Rehabilitation and Corrections and is serving a sentence of 5 years, 10 months that is set to expire on August 4, 2024. Further, while he was able [Father] did not satisfactorily meet the objections of his case plan prior to going to prison.

Therefore, A.K. cannot be place with her father within a reasonable time and should not otherwise be placed with him.

{¶ 54} Neither Father nor C.F. dispute these findings regarding Father's ability to have custody of A.K. Instead, Father argues that the juvenile court erred in finding he failed to provide for A.K.'s care, because he and Mother attempted to convey legal custody of A.K. to C.F., and Father later sought to place A.K. with his sister, A.C., with both C.F. and A.C. suitable kinship placements. C.F., in turn, argues that she would have been a suitable, nonrelative placement during the period of temporary custody, and the juvenile court should have found the GAL and CASA recommendations were not supported by credible evidence.

{¶ 55} Father's argument is contradicted by the record of proceedings. While he may have intended C.F. or A.C. to have custody of A.K., he made no attempt to request such placement until the first day of trial. Pursuant to R.C. 2151.353(B)(3), Father could have filed a motion "prior to the dispositional hearing," requesting an award of legal custody to "any other person." He did not do so, but instead, agreed to placement with the Agency. Father's reliance on the Agency's rules, specifically Ohio Adm.Code 5101:2-42-05, is also misplaced. The regulation he cites expressly provides that "[t]his rule shall not contravene the placement of a child * * * by law enforcement or any court of jurisdiction." Ohio Adm.Code 5101:2-42-05(I).

{¶ 56} Much of Father's and C.F.'s argument, therefore, challenges the Agency's initial placement of A.K. with her foster family, which prevented C.F. and A.C. from

forming a bond with A.K. Their argument omits the fact that Mother continued to work her case plan and have visitation with A.K., with the goal of reunification before Mother's untimely and unexpected death when A.K. was about 10 months old. The juvenile court was faced with A.K.'s reality after Mother's death, which included Father's initial agreement for placement of A.K. with the foster family and the resulting lack of contact between A.K. and C.F. or A.C., and not the "should have been, could have been" arguments presented by Father and C.F. Therefore, with no contemporaneous challenge to the initial placement of A.K., we address the "best interests" analysis as it existed in the record before the juvenile court.

{¶ 57} In its judgment, after weighing the factors of R.C. 2151.414(D), the juvenile court found by clear and convincing evidence that an award of permanent custody to the Agency was in the best interest of A.K. The juvenile court expressly noted consideration of

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in division (E)(7) to (11) apply in relation to the parents and child * * *

R.C. 2151.414(D)(1).

{¶ 58} The facts noted by the juvenile court, in support of its findings, included the strong bond between A.K. and her foster family and the lack of any relationship with C.F. or A.C., despite their attempts to have contact. The juvenile court also noted the Agency's concerns regarding placement with either C.F. or A.C.

{¶ 59} As to C.F., the court noted she resides with her husband and three of her children, and each child has been diagnosed with epilepsy or a seizure disorder. One child also has an autoimmune disease. C.F. initially told the caseworker assigned to A.K. that she and her husband were having marital problems, and discussing divorce, but at the time of trial they had reconciled. C.F. also had a history of Agency involvement concerning her own children, including a substantiated report of excessive absences from school for her daughter due to head lice. After Agency contact regarding the absences, C.F. indicated mistrust of the Agency and refused to cooperate with any inquiry. The family moved to another county and refused further contact, resulting in closure of the case.

27.

{¶ 60} C.F. also has medical issues and receives counseling for PTSD. She was found guilty of misdemeanor marijuana possession in November 2018, but the conviction did not prevent her from receiving her bail bondsman license. C.F. works from home, and the juvenile court noted that she was "very busy" with her work, her own special needs children, and her medical issues, and A.K. has a "need of much time and attention." Finally, C.F. had no visitation with A.K., so formed no bond with her.

{¶ 61} As to A.C., the juvenile court noted she had no experience with children, aside from watching Father's other child and C.F.'s son. She is studying to become a registered nurse, with the goal to become a nurse practitioner, and would likely hire a babysitter for A.K. while at school or work. A.C. lives in a two-bedroom home with her husband and mother-in-law, who suffers from dementia, but they plan to buy a larger home. A.C. was convicted in the past of cruelty to animals, served a ten-day sentence, and completed 200 hours of community service, but the conviction will not affect her licensure. A.C. also had no visitation with A.K., and therefore, formed no bond.

{¶ 62} In contrast, A.K. has resided with her foster family since birth in June 2018, and her foster parents have met all of her needs, including her special needs. A.K. has developed a good relationship with her foster family and is thriving, and her foster parents have expressed a desire for adoption. The juvenile court found that A.K.'s need for permanency would best be achieved by permanent custody with the Agency with a plan for adoption by A.K.'s foster family.

28.

{¶ 63} The Agency and the GAL conducted investigations regarding both C.F. and A.C. and recommended permanent custody and continued placement with A.K.'s foster family as in A.K.'s best interest. C.F. argues, however, that the juvenile court erred in finding her "unsuitable." The "best interest" inquiry differs from a suitability determination, with suitability considered only in reference to termination of existing parental rights. *See In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977) ("parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children."); *see also In re Davis*, 7th Dist. Mahoning No. 02-CA-95, 2003-Ohio-809, ¶ 12 ("The *Perales* 'suitability' test is distinguishable from the 'best interest' test. * * * The suitability test * * * requires a detriment to the child to be shown before the court takes him/her away from an otherwise suitable parent.") (citations omitted). Father also argues his parental right to choose who should have custody of A.K. However, the "best interests" test places the "ultimate welfare of the child" above the "natural rights of a parent[.]" (Citation omitted.) *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 64} In this case, the juvenile court considered the testimony and evidence and determined permanent custody for the Agency and adoption by the foster parents to be in the best interest of A.K. Having reviewed the record, we find the evidence supports this judgment, and therefore find no error in the juvenile court's determination. Accordingly, we find Father's first assignment of error, and C.F.'s third, fourth, and fifth assignments of error not well-taken.

29.

## Cumulative Error

{¶ 65} In her sixth and final assignment of error, C.F. argues that cumulative error at trial violated her right to due process. The cumulative error doctrine provides for reversal "when the cumulative effect of errors in a trial [prevents] a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 165, ¶ 152, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 66} In reviewing C.F.'s assignments of error, we found no error, let alone instances of harmless error. Accordingly, C.F. fails to point to "multiple instances of harmless error." *Belton* at ¶ 153, citing *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). We find C.F.'s sixth assignment of error, alleging cumulative error, not well-taken.

## Conclusion

{¶ 67} Having found that the juvenile court committed no error prejudicial to appellants, and that substantial justice has been done, we affirm the judgment of the Ottawa County Court of Common Pleas, Juvenile Division. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

In re A.K.
C.A. No. OT-20-001

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Gene A. Zmuda, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.