[Cite as *Row v. Row*, 2022-Ohio-2525.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Lynda M. Row

      Appellee

v.

James D. Row, III.

      Appellant

Court of Appeals No.  L-21-1231

Trial Court No.  DR-2018-0397

**<u>DECISION AND JUDGMENT</u>**

Decided:  July 22, 2022

* * * * *

Margaret G. Beck, for appellee.

Martin J. Holmes, Sr., for appellant.

* * * * *

**MAYLE, J.**

## I.  Introduction

{¶ 1} The defendant-appellant, James D. Row III, appeals a final judgment entry of divorce, issued by the Lucas County Court of Common Pleas, Domestic Relations Division.  The judgment set forth orders that divided the parties' property, determined

their parental rights and responsibilities, and required appellant to pay child support, spousal support, and attorney fees. As set forth below, we affirm the judgment.

## II. Background

{¶ 2} The appellant, James Row ("James") and the appellee, Lynda Row ("Lynda") were married on July 28, 2001. The parties have three children together, D.R., born in 2005; A.R., born in 2009; and V.R., born in 2012. Lynda filed for divorce on May 14, 2018, and James counterclaimed.

{¶ 3} Temporary orders were put into place on November 28, 2018, that, among other issues, allocated James' parenting time with the parties' children. Generally, James was granted parenting time that was similar to the "local minimum schedule," specifically every Monday evening, alternating weekends, and time for holidays and vacations.

{¶ 4} The "most highly contested issue in the case" was James' use of alcohol and the extent to which it affects his parenting. James was convicted of driving under the influence of alcohol three times, most recently in 2017. In October of 2018, police found James "face down in the street," after drinking all day and then driving to his place of business. James was administered Narcan and taken to the hospital but left before being seen. After the incident and at his attorney's urging, James was evaluated at Harbor Behavioral Healthcare. According to the Harbor report, James continues to drink alcohol "despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance." But, Harbor did not recommend any

2.

treatment due to "client['s] self report [that he] does not meet criteria for an Alcohol Use Disorder."

{¶ 5} The case was tried over three days, beginning on October 2, 2019. The first witness to testify was the guardian ad litem ("GAL"), who recommended that Lynda be named the residential parent and legal custodian of the children.

{¶ 6} With respect to parenting time, the GAL's recommendations were specific to each child. As to the two younger children, the GAL recommended that parenting time continue according to the local minimum schedule. As to D.R., the GAL recommended that James have parenting time "on a fifty-fifty basis" with Lynda. The GAL cited several reasons for the different recommendations. For example, D.R told the GAL that he preferred living with James, which was consistent with the GAL's observation that D.R. was "much more comfortable at dad's house." Further, according to the GAL's opinion, the younger children would benefit from, and had requested, "some space" from D.R. Finally, the GAL concluded that the arrangement would give "both parents * * * one-on-one parenting time."

{¶ 7} In its September 30, 2021 Decision, the trial court granted the parties a divorce. The court named Lynda as the residential parent and legal custodian of all the children, reduced James' parenting time for all children, and decided a number of other issues. The trial court noted that James needed to address his "serious alcohol problem" before any changes would be made to his parenting time. The trial court's decision was

3.

reduced to a Final Judgment Entry of Divorce, journalized on October 28, 2021. James appealed and raises five assignments of error for our review:

> **Assignment of Error No. 1**: The trial court abused its discretion or otherwise erred by restricting Husband's parenting time, contrary to the wishes of both parents and the recommendations of the Guardian ad Litem, and against the best interests of the children.

> **Assignment of Error No. 2**: The trial court erred in ordering the sale of the marital home.

> **Assignment of Error No. 3**: The trial court erred in 1) failing to find Wife committed financial misconduct or contempt of court by failing to disclose and/or concealing her Michigan retirement benefits and 2) ordering Husband to pay for division of the concealed asset.

> **Assignment of Error No. 4**: The trial court erred in failing to address or otherwise rule upon several motions.

> **Assignment of Error No. 5**: The trial court erred in ordering Husband to pay Wife's attorney fees and not awarding Husband attorney fees.

### III. Parenting Time

{¶ 8} In his first assignment of error, James alleges that the trial court abused its discretion by restricting his parenting time with the children.

4.

{¶ 9} We review a trial court's decision regarding the allocation of parenting time under an abuse of discretion standard. *See, e.g., Cwik v. Cwik,* 1st Dist. Hamilton No. C-090843, 2011-Ohio-463, ¶ 42; *accord In re K.M.L.,* 9th Dist. Wayne No. 17AP0009, 2018-Ohio-344, ¶ 6. In order to find that a trial court abused its discretion, an appellate court must find that the trial court's decision was "unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 10} When a trial court determines parenting time, "it must do so consistent with the best interests of the children involved with consideration of the factors mentioned in R.C. 3109.051(D)." *In re K.L.M.* at ¶ 9. The statute provides, in relevant part,

(D) In determining whether to grant parenting time to a parent pursuant to this section * * *, in establishing a specific parenting time or visitation schedule, and in determining other parenting time matters under this section * * * or visitation matters under this section * * *, the court shall consider all of the following factors:

(1) The prior interaction and interrelationships of the child with the child's parents, siblings, and other persons related by consanguinity or affinity * * *;

(2) The geographical location of the residence of each parent and the distance between those residences * * *;

5.

(3) The child's and parents' available time, including, but not limited to, each parent's employment schedule, the child's school schedule, and the child's and the parents' holiday and vacation schedule;

(4) The age of the child;

(5) The child's adjustment to home, school, and community;

(6) If the court has interviewed the child in chambers, pursuant to division (C) of this section, regarding the wishes and concerns of the child as to parenting time by the parent who is not the residential parent * * * or as to other parenting time or visitation matters, the wishes and concerns of the child, as expressed to the court;

(7) The health and safety of the child;

(8) The amount of time that will be available for the child to spend with siblings;

(9) The mental and physical health of all parties;

(10) Each parent's willingness to reschedule missed parenting time and to facilitate the other parent's parenting time rights, and with respect to a person who requested companionship or visitation, the willingness of that person to reschedule missed visitation;

(11) In relation to parenting time, whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child;

whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(12) In relation to requested companionship or visitation by a person other than a parent, whether the person previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether the person, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of the adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of an offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that

7.

the person has acted in a manner resulting in a child being an abused child or a neglected child;

(13) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(14) Whether either parent has established a residence or is planning to establish a residence outside this state;

(15) In relation to requested companionship or visitation by a person other than a parent, the wishes and concerns of the child's parents, as expressed by them to the court;

(16) Any other factor in the best interest of the child.

{¶ 11} "'A trial court need not make explicit reference to [the] factors [set forth in R.C. 3109.051] provided that it is apparent from the record that the factors were considered.'" *K.M.L.* at ¶ 6, quoting *Pirkel v. Pirkel,* 9th Dist. Lorain No. 13CA010436, 2014-Ohio-4327.

{¶ 12} In this case, the trial court did not expressly analyze the factors set forth in R.C. 3109.051. But, it did examine, at length, the factors set forth in R.C. 3109.04 with respect to its custody determination. And, the court noted that "many of the [best interest] factors [set forth in R.C. 3109.04] also are listed in R.C. 3109.051(D)." Upon review, we glean that the trial court found the following evidence relevant to its

8.

determination that a continuation of "court schedule visitation is not in the children's best interest."

{¶ 13} When considering the best interests of the children, the court found that James "has undercut [Lynda's] parental authority at every opportunity especially with the oldest son. [James] has been demeaning and degrading to [Lynda]. He used threats of withholding financial support and attempts to alienate all three sons to get his way in the divorce." This finding is also relevant to R.C. 3109.051(D)(1), which required the trial court to consider the prior interaction and interrelationships of the children with the children's parents when determining parenting time.

{¶ 14} When considering the best interests of the children, the court found that Lynda has been "primarily responsible" for such things as homework, school meetings, D.R.'s individual education plan, and the children's medical and counseling appointments. By contrast, the court found that James "rarely attends [those events], except for sporting events." This finding is also relevant to R.C. 3109.051(D)(3), which required the trial court to consider the children's and parents' available time, including employment schedules, and school schedules when determining parenting time.

{¶ 15} When considering the best interests of the children, the court found that the children "seem well adjusted to school, get good grades, and are involved in sports." It largely credited Lynda for the children's well-being, in light of her efforts identified above. This finding is relevant to R.C. 3109.051(D)(5), which required the trial court to

9.

consider the children's adjustment to home, school, and community when determining parenting time.

{¶ 16} When considering the best interests of the children, the trial court interviewed the children in this case, individually and together, in the presence of the GAL. From that interview, the GAL's report, and the testimony at trial, the trial court "determined the children's wishes." This finding is relevant to R.C. 3109.051(D)(6), which required the trial court to consider the wishes of the children when determining parenting time.

{¶ 17} When considering the best interests of the children, the trial court found that James "has a dangerous driving record which may put the children in danger," by, for example, "routinely [driving them despite being] under a license suspension." This finding is relevant to R.C. 3109.051(D)(7), which required the trial court to consider the children's health and safety when determining parenting time.

{¶ 18} When considering the best interests of the children, the court made specific reference to James' "three DUI's, a hit-skip accident, and an open container citation" and the 2018 incident in which James was "found unconsciousness" and had to be revived. The court also noted testimony regarding "numerous incidents where [father] was observed to be drinking at inappropriate places (e.g. his son's games) and to excess." Based upon the evidence, the court concluded that James has a "serious alcohol problem" but is in "deep denial" about his problem and lies "even to substance abuse evaluators."

10.

This finding is relevant to R.C. 3109.051(D)(9), which required the trial court to consider the mental and physical health of all parties.

{¶ 19} When considering the best interests of the children, the court offered a harsh assessment of James, noting that he "has shown little regard for the court's orders * * * [and] for the law," as evidenced by his refusal to cooperate in selling the marital home and failure to pay family expenses and child support. This finding is relevant to R.C. 3109.051(D)(16), which required the trial court to consider any other factor in the best interest of the child.

{¶ 20} The trial court concluded that James "needs help and needs to control his behavior in order to have a positive relationship with his children." Accordingly, in order to "provid[e] [James] with the help he needs and [to] protect the children," the court further limited James' parenting time to alternating Sundays, from noon until 6 p.m., plus holidays. But, the court ordered that—"upon sufficient proof of completion of [the following five] conditions including a significant period of sobriety"—James could petition the court for reinstatement of the "normal" schedule, i.e. the local minimum schedule set by the November 2018 temporary orders. The court conditioned a return to that schedule on the following:

1. [James] shall submit to a comprehensive alcohol and drug assessment at Centralized Drug Testing Unit, 1302 Washington St., Toledo, Ohio 43604 at his expense. [James] must fully and truthfully disclose all

alcohol or drug related incidents whether they resulted in legal findings or not.

2. [James] must complete all recommendations of the alcohol/drug assessment, including treatment, counseling, and group sessions for a period of time to enable the evaluator to report to the court that *significant progress* has been made.

3. [James] shall install an Ignition Interlock System on his vehicles at his expense, *until such time as the evaluator deems it no longer necessary*.

4. [James] is prohibited from consuming alcohol for a 24 hour period prior to the commencement of, and during parenting time.

5. [James] shall submit the report of the alcohol assessment, follow-up evaluations, attendance records and the proof of the installation of the Ignition Interlock System to this court's court counseling office.

(Emphasis added; Sept. 30, 2021 Decision at 7-8).

{¶ 21} On appeal, James "emphatically submits" that the restrictions imposed by the court are not in the best interests of the children and that the court abused its discretion by failing to "maintain[] at least the parenting time status quo set by the [November 2018] temporary orders."  James makes several arguments in support of his claim, and we address each below.

{¶ 22} First, James argues that the trial court's "drastic departure" from the schedule that was in place under the temporary orders is "contrary to the wishes of both

12.

parents and the recommendations of the [GAL]." James claims that he and Lynda mutually "requested" that the court "continue" the parenting schedule established by those orders.

{¶ 23} Upon review, Lynda did *not* articulate a preference for any particular parenting time schedule, nor did she request a continuation of the schedule set by the temporary orders. Rather, Lynda requested that *any* parenting time be conditioned upon James having a "valid driver's license, not under suspension or restriction," that James install an "Ignition Interlock System" on his vehicle, and that James be ordered not to consume alcohol or drugs (unless prescribed) for 24 hours prior to his parenting time. (Sept. 30, 2021 Decision at 3). On appeal, Lynda urges this court to affirm the lower court's judgment, which adopted many of her proposed conditions. Moreover, since the appeal was filed, Lynda has taken the position that "[c]onsidering the seriousness of [James's] alcoholism," a return to the prior parenting time schedule "could jeopardize the children's safety." (Appellee's Dec. 22, 2021 memorandum opposing appellant's motion for a stay). Based upon the above, we reject James' claim that the trial court's judgment as to its parenting time order is "contrary to [Lynda's] wishes."

{¶ 24} James also cites the testimony of his own father ("grandfather") who told the court that James "would [n]ever put [the children] in harm's way" and that he had not witnessed James consuming any alcohol since the case was filed. But, grandfather was found to be uninformed regarding James' use of alcohol. At the hearing, the GAL testified that when he asked, "how can you have no concerns if your son is [rescued by]

13.

the fire department?" he realized that neither of James' parents knew about the incident and that he had unintentionally "outed" James to them. This prompted the GAL to ask James if this scenario—when questioning other witnesses identified by James—was likely to continue. In response, James "instructed" the GAL "not [to] follow up" with his potential witnesses so as to avoid "embarrass[ing]" father.

{¶ 25} Next, James argues that the trial court's decision is contrary to the opinion of the GAL, who recommended that James and Lynda share parenting time of D.R. equally, and that the former visitation schedule continue as to the two younger children. James highlights the testimony of the GAL, who told the court that he observed no firsthand evidence of alcohol consumption by father, including during an unannounced home visit.

{¶ 26} In its decision, the trial court determined that "James has a more serious alcohol problem than that [GAL] was led to believe." The court's conclusion is supported by the record. As the GAL himself acknowledged, his opinion—with regard to James' need for alcohol treatment—was entirely dependent upon the accuracy of James' self-reporting. And, even the GAL concluded that James "clearly has issues related to alcohol abuse and potentially dependency as well." He testified,

> Clearly one has a problem with alcohol if they've got three DUI's,
> and they're drinking to the point where they fall down outside their place of
> work, and the fire department has to come and provide Narcan to bring you
> back to life. I mean, as I read the police report it was a little bit more than a

fall. There was some consumption that was going on there to the point where he, quite frankly, could have died that day.

{¶ 27} And, while the GAL could not say whether James' use of alcohol was "impact[ing] his parenting," he did verify that James regularly drove with a suspended license, including while his children were in the car. The GAL was also highly critical of James for disparaging Lynda to the children by, for example, sending text messages to D.R. with "language that is inexcusable" to describe her.

{¶ 28} In any event, the trial court was not bound by the GAL's recommendations, and the trial court had the discretion to determine the weight and credibility of the GAL's testimony. *In re A.K.*, 6th Dist. Ottawa No. OT-20-001, 2020-Ohio-4700, ¶ 46. In this case, the record summarized above supports the trial court's decision to adopt a parenting time schedule that is different from the schedule that was proposed by the GAL. Thus, the trial court's determination was not arbitrary, unreasonable, or unconscionable.

{¶ 29} Next, James argues that the conditions set by the trial court are "vague and subject to numerous different interpretations, such that their imposition is an abuse of discretion on their face." Specifically, James complains that the second condition—that he make "significant progress" toward any recommendations made in the alcohol assessment—is "undefined and entirely left open to interpretation." James also complains that the third condition—requiring him to install an ignition interlock system "until such time as the evaluator deems it no longer necessary"—is "similarly vague."

15.

**{¶ 30}** A trial court is granted broad authority to fashion a parenting time schedule that protects the best interest of the children, and may condition parenting time upon the completion of conditions that are designed to address a parent's substance abuse issue. Indeed, courts have upheld similar conditions in other cases, finding that such conditions are neither too vague nor too restrictive. *See, e.g., Matters of T.T.,* 5th Dist. Coshocton No. 2021CA0016, 2022-Ohio-218, ¶ 31 (finding that a plan conditioning mother's parenting time on her "following the recommendations" of the behavioral health provider to "receive and successfully complete residential treatment" was "neither vague nor too restrictive"); *see also Clemens v. Clemens*, 5th Dist. Morgan No. 21AP0001, 2021-Ohio-3094, ¶ 60 (no abuse of discretion where the trial court "specifically stated in its judgment entry that father could petition the court for extended visitation upon providing proof of attending and successfully completing a drug and alcohol assessment, and by participating in and successfully completing treatment as recommended by the counselor"). Accordingly, the trial court acted within its authority when it restricted James' parenting time until he complied with certain conditions relating to his alcohol use, and we also conclude—similar to the cited cases—that those conditions are not unreasonably vague or too restrictive.

**{¶ 31}** Finally, James argues that the trial court's "outright rejection" of his report from Harbor—which states that he "did not meet the criterial for alcohol abuse"— demonstrates that it is "wholly unclear what criteria the trial court would accept as sufficient satisfaction of the conditions" imposed by the court.

16.

{¶ 32} To the contrary, the trial court clearly stated what it would accept as proof that James had satisfied the enumerated conditions—i.e., James "shall submit" to an alcohol and drug assessment at CDTU in Toledo and that he "complete all recommendations of the * * * assessment." There is nothing "unclear" about the trial court's directive.

{¶ 33} We are similarly unpersuaded by James' claim—as set forth in a post-appellate brief filing, and repeated at oral argument—that, when he and his attorney appeared at CDTU, they were told that CDTU "does not provide comprehensive alcohol and drug assessments."[1] Importantly, James gives no indication that he ever communicated that fact *to the trial court*. If James decides to inform the trial court that CDTU does not provide such assessments—and, assuming that CDTU, in fact, does not provide comprehensive alcohol and drug assessments, as James alleges—the trial court may determine if it wishes to dispense of this condition completely or if it wishes to modify its order to allow James to obtain a drug and alcohol assessment at another suitable facility. In any event, James' argument regarding the condition that requires a comprehensive alcohol and drug assessment at CDTU does not provide a basis for this court to conclude that the trial court's parenting time decision was an abuse of discretion.

{¶ 34} In sum, we find that the record supports the trial court's parenting time decision. We cannot say that the trial court's balancing of the statutory factors set forth

[1] *See* Appellant's April 13, 2022 second motion for relief and stay of judgment pending appeal pursuant to Civ.R. 75(H), which was denied on April 28, 2022.

17.

in R.C. 3109.051 or the weight it assigned to those factors was arbitrary, unreasonable, or unconscionable. Accordingly, we find James' first assignment of error is not well-taken.

### IV. Sale of the Marital Home

{¶ 35} In his second assignment of error, James alleges that the trial court erred when it ordered the sale of the parties' marital home.

{¶ 36} The trial court has statutory authority to order the sale of property and to direct the use of proceeds. R.C. 3105.171(J) provides that, "[t]he court may issue any orders under this section that it determines equitable, including, but not limited to, either of the following types of orders":

> (1) An order granting a spouse the right to use the marital dwelling * * * for any reasonable period of time;

> (2) An order requiring the sale or encumbrancing of any real or personal property, with the proceeds from the sale and the funds from any loan secured by the encumbrance to be applied as determined by the court.

{¶ 37} An appellate court "yields broadly" to a trial court's division of marital property. *Glover v. Glover,* 2d Dist. Greene No. 2009-CA-23, 2009-Ohio-5742, ¶ 10. Thus, "an appellate court may not reverse a trial court's property allocation decision absent a showing of an abuse of discretion." *Gerhardstein v. Gerhardstein*, 6th Dist. Sandusky No. S-21-002, 2021-Ohio-4341, ¶ 15-16 citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 421 N.E.2d 1293 (1981); *see also Booth v. Booth*, 44 Ohio St.3d 142, 144, 541

18.

N.E.2d 1028 (1989). The question here is whether the court abused its discretion when it ordered the parties' home sold and the proceeds divided accordingly.

{¶ 38} In ordering the sale, the court determined that neither party could afford the house payments, especially in light of their respective "sizeable credit card balances."

{¶ 39} The court also found that James "consistently acted in bad faith regarding the house" by "scuttle[ing] a sale of the property," and by "underpa[ying] support—without a valid explanation—just when Lynda needed the agreed upon spousal support to pay the mortgage." When the house went into foreclosure, it was grandfather who "loaned" James money to bring the mortgages current. Under the circumstances, the court found that "it would be inequitable to award the home to [James]."

{¶ 40} On appeal, James argues that the court was "needlessly punitive" to order the sale of the marital home, "two years after the date of the final hearing." He argues that he is now "in a position" to maintain the home and that allowing the children to remain in their "lifelong home" is in their best interests.

{¶ 41} Courts routinely order the sale of a marital home as a means to alleviate the parties' financial constraints. *See, e.g., Kindred v. Kindred,* 8th Dist. Cuyahoga No. 73858, 1999WL462370 (July 1, 1999) (no abuse of discretion in ordering the sale of the marital home where neither party's income would allow a possible "buy out" of the other's interest in the home); *accord Bolden v. Bolden,* 11th Dist. Geauga No. 2006-G-2736, 2007-Ohio-6249, ¶ 72-73 (decision to order sale of home was equitable where, given the appellant's "limited means," it was unclear how she could have shouldered the

financial burden of compensating spouse for one half of the equity in the house). *Huntington v. Huntington*, 6th Dist. Huron No. H-87-31, 1988WL37506, *2 (Apr. 8, 1988) (affirming property distribution where the marital home was "the only substantial asset of the parties, and by ordering it sold, the parties would be able to divide the proceeds and continue with their lives").

{¶ 42} Here, the parties agreed to list and sell the house, effective March 1, 2019, with a list price of $239,900. But, after the house was listed, James removed the "for sale" sign from the yard, made showing the home "difficult," and rejected an offer of $225,000 without making a counter offer. Most importantly, given James' obligation to pay child and spousal support, we cannot find that the trial court abused its discretion when it concluded that James was not able to satisfy the mortgage payments on his own.

{¶ 43} Thus, we find that the trial court did not abuse its discretion by ordering the sale of the home, and James' second assignment of error is not well-taken.

### V. Claims of Financial Misconduct

{¶ 44} In his third assignment of error, James argues that the trial court erred in "failing to find" that Lynda committed financial misconduct when she did not disclose her interest in a teacher's retirement plan from the state of Michigan. R.C. 3105.171(E) ("Division of marital property, separate property") provides, in relevant part,

> (3) The court shall require each spouse to disclose in a full and complete manner all marital property, separate property, and other assets, debts, income, and expenses of the spouse.

(4) If a spouse has engaged in financial misconduct, including, but not limited to * * * concealment [or] nondisclosure * * * of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.

(5) If a spouse has substantially and willfully failed to disclose marital property, separate property, or other assets, debts, income, or expenses as required under division (E)(3) of this section, the court may compensate the offended spouse with a distributive award or with a greater award of marital property not to exceed three times the value of the marital property, separate property, or other assets, debts, income, or expenses that are not disclosed by the other spouse.

{¶ 45} A spouse commits "financial misconduct" if he or she engages in "some type of wrongdoing" and he or she "either profit[s] from the misconduct or intentionally defeat[s] the other spouse's distribution of marital assets." *Brown v. Brown,* 8th Dist Cuyahoga No. 100499, 2014-Ohio-2402, ¶ 13. Financial misconduct "necessarily implicates wrongdoing such as one spouse's interference with the other's property rights or the offending spouse's profiting from the misconduct." *Kim v. Kim*, 9th Dist. Summit Nos. 28684, 29144, 2020-Ohio-22, ¶ 24-25. "When a spouse engages in financial misconduct, [R.C. 3105.171(E)(4)] provides the trial court with discretion to compensate the offended spouse with a distributive award or with a greater award of marital

property." *Id.* The party alleging the existence of financial misconduct bears the burden of proof. *Kim* at ¶ 25*; see also Brown* at ¶ 13.

{¶ 46} In this case, Lynda identified her interest in four retirement plans during the discovery phase. All of them related to various teaching positions she held in the state of Ohio. At trial, when asked why she failed to produce any "statement of retirement" from a "Michigan Member Investment Plan" ("MIP"), Lynda testified that "[t]here isn't a state teacher retirement because I wasn't vested." After trial, on December 12, 2019, James filed a "motion for leave of court to allow the submission of evidence that plaintiff substantially and willfully failed to disclose at the time of trial." James alleged that he obtained "documentation" establishing that Lynda was "enrolled" in the MIP and that it had a total balance of $26,355.27. While the motion was pending, James filed a motion to show cause why Lynda should not be held in contempt of court for "woefully fail[ing] to disclose [her] membership interest" in the MIP.

{¶ 47} In its September 30, 2021 Decision granting the parties a divorce, the trial court specifically denied James' "motion to re-open the trial" and his "request for damages." (Decision at 14-15). The trial court cited three reasons for its decision: James' failure to provide the court with a copy of the MIP documentation, "even though he claims to have submitted it to an outside pension evaluat[or]," James' reliance on "obvious[] hearsay," and the fact that evidence of Lynda's interest in the MIP was "easily discoverable" prior to trial. But, the court also found that the MIP was marital property

22.

"to the extent that it exists," and it ordered the asset divided equally, with James to bear the expense of the division because he "stands to benefit from [it]." (Decision at 14).

{¶ 48} On appeal, James argues that the trial court "improperly plac[ed] the burden of discovering Lynda's assets on Husband" and further erred in failing to "make a finding of financial misconduct."

{¶ 49} Contrary to James' arguments, the trial court properly placed the burden on James to establish Lynda's financial misconduct. *Kim* at ¶ 25. And, in this case, James failed to put forth any evidence to suggest that Lynda intentionally concealed her interest in the MIP. Financial misconduct "requires 'some element of wrongful intent or scienter[.]'" *Kim* citing *Havrilla v. Havrilla*, 9th Dist. Summit No. 27064, 2014-Ohio-2747, ¶ 47; *accord Orwick v. Orwick*, 7th Dist. Jefferson No. 04 JE 14, 2005-Ohio-5055, ¶ 25. To determine whether financial misconduct has occurred, "a court must look to the reasons behind the questioned activity or the results of the activity and determine whether the wrongdoer profited from the activity or intentionally dissipated, destroyed, concealed, or fraudulently disposed of the other spouse's assets." *Id.*

{¶ 50} Here, although Lynda did not identify the MIP in discovery, she explained that she did not think she was vested in the plan. While James characterizes Lynda's testimony as "less than candid," he points to no evidence to establish that Lynda knowingly concealed the MIP. For this reason, we find that the trial court did not abuse its discretion in not finding that Lynda committed financial misconduct. James' third assignment of error is found not well-taken.

23.

## VI. Post-Trial Motions

{¶ 51} In his fourth assignment of error, James argues that the trial court erred when it failed to rule upon three motions all of which were filed after the trial but before the final judgment entry of divorce.

{¶ 52} First, James alleges that the trial court did not "address" the issue of Lynda's financial misconduct, which was first raised by James in his December 12, 2019 motion to submit additional evidence. Although the trial court did not *explicitly* find that Lynda did *not* commit financial misconduct, it implicitly and necessarily made this finding when it denied the motion, which was premised upon James' claims that Lynda committed financial misconduct. And, as set forth above, we have affirmed the trial court's ruling. Accordingly, we reject James' claim that the trial court did not "address" the issue of Lynda's financial misconduct.

{¶ 53} James also argues that the trial court failed to rule upon his June 25, 2020 "motion for reallocation of parental rights; for modification of child support and spousal support; and for plaintiff to show cause why she should not be found in contempt [with respect to the MIP]" and his July 15, 2020 motion to hold Lynda in contempt for violating a temporary order that required the parties to consult with one another before filing tax returns.

{¶ 54} James' contempt motions are based upon alleged violations of the trial court's temporary orders. But, "[t]emporary orders typically merge into the final order and become moot. It has been explained, 'In a domestic relations action, interlocutory

24.

orders are merged within the final decree, and the right to enforce an interlocutory order does not extend beyond the decree, unless the interlocutory obligation has been reduced to a separate judgment or has been specifically referred to in the decree.'" *Dimmerling v. Dimmerling*, 7th Dist. Noble No. 18NO0460, 2019-Ohio-2710, ¶ 140-141, quoting *Cotter v. Cotter*, 9th Dist. Summit No. 25656, 2011-Ohio-5629, 10, citing *Colom v. Colom*, 58 Ohio St.2d 245, 389 N.E.2d 856, syllabus (1979). In *Dimmerling,* the wife argued that the trial court erred in failing to rule on her contempt motion, which stemmed from her claim that husband violated a temporary order "prohibiting [husband] from harassing and threatening her." *Id.* at ¶ 138. The appellate court rejected this argument, concluding that, "the final divorce decree in this case disposed of all matters and the temporary orders merged into the final order rendering the temporary order and any alleged violation of it moot." *Id.* at ¶ 141. *See also Bokeno v. Bokeno*, 12th Dist. Butler No. CA2001-07-170, 2002-Ohio-3979, 6 ("Unlike the parties' obligation to pay their respective credit card debts, Rose's obligation to pay the mortgage and utilities was also not specifically referred to in the final divorce decree. As a result, such temporary order was merged within the divorce decree and that divorce decree replaced all that transpired before it.").

{¶ 55} We reach the same result here. Because the final decree disposed of all matters before the court, the temporary orders that preceded it merged into that order, rendering them and any violations thereof moot.

{¶ 56} For all these reasons, James' fourth assignment of error is not well taken.

25.

## Attorney Fees

**{¶ 57}** In his fifth assignment of error, James contends that the trial court erred in awarding attorney fees to Lynda and in not awarding them to him.

**{¶ 58}** Pursuant to R.C. 3105.73(A), "a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable." Such an award is reviewed for an abuse of discretion. *Kim* at ¶ 47.

**{¶ 59}** In awarding Lynda attorney fees, the court found,

Wife testified that at the time of trial, the amount owed to her attorney as and for attorney fees was approximately [$5,800-$6,000]. This case was complicated [in] no small part [by] Husband's failure to comply with multiple consent orders that he agreed to. Further, the trial itself was complicated by Husband's failure to cooperate with the sale of the marital home, again, as he agreed to in various court orders.

The Court finds that based on Husband's conduct, Husband shall pay Wife's attorney fees outstanding at the time of trial. (Decision at 23).

**{¶ 60}** On appeal, James argues that the trial court abused its discretion by awarding fees to Lynda "without evidence or a detailed fee statement" to support the award. We disagree.

**{¶ 61}** In awarding Lynda attorney fees, the court specifically referred to testimony that Lynda incurred "around $5,800 * * * almost $6,000" in attorney fees, as of the October 4, 2019 trial. Such testimonial evidence—even in the absence of an itemized

26.

fee statement—can support an attorney fee award under R.C. 3105.73. *See, e.g., Kendall v. Kendall,* 6th Dist. Ottawa No. OT-08-054, 2009-Ohio-4067, ¶ 73 (sufficient evidence to support an award found where the record contains testimonial evidence establishing the number of hours expended and attorney's hourly rate).

{¶ 62} In addition, James also argues that the trial court's decision to award fees was an abuse of discretion because his "reluctance to walk away from" the family home "should not subject him to attorney fees." But, in determining whether to award attorney fees in a divorce proceeding, a court may consider any relevant factors the court deems appropriate, "including the conduct of the parties." R.C. 3105.73(A). In this case, the trial court's findings regarding James' behavior are supported by the record—in fact, even James concedes that he was "difficult" with respect to the sale of the house.

{¶ 63} Moreover, "[b]ecause a court addresses an award of attorney fees through equitable considerations, a trial court properly can consider the entire spectrum of a party's actions, so long as those actions impinge upon the course of the litigation." *Padgett v. Padgett*, 10th Dist. Franklin No. 08AP-269, 2008-Ohio-6815, ¶ 17. Here, we note that the trial court based its decision to award attorney fees not just on James' conduct with regard to the sale of the home, but also his failure to comply with multiple consent orders—including orders that required him to pay monthly expenses and child and spousal support. We find that these considerations were appropriate, and we see no abuse of discretion. *Accord Kendall* at ¶ 74 (award was reasonable where "the record [was] replete with evidence of delay, confusion, and unnecessary expenditure of

27.

time and effort on the part of the court and opposing counsel that was directly caused by [husband's] refusal to cooperate with court orders and his failure to retain legal counsel").

{¶ 64} Finally, James challenges the trial court's failure to award *him* attorney fees. He claims he incurred "significant legal fees" in response to "Wife's failure to comply with * * * orders," particularly the order requiring the parties to consult with one another before filing their tax returns. Given our decision to affirm the trial court's denial of James' contempt motion—on that same issue—we cannot say that the trial court abused its discretion in not awarding attorney fees.

{¶ 65} Based on the above circumstances, we conclude that the trial court was not unreasonable in awarding Lynda attorney fees and in denying them to James. Accordingly, James' fifth assignment of error is overruled.

### Conclusion

{¶ 66} As set forth above, James' assignments of error are overruled, and the October 28, 2021 judgment of the Lucas County Court of Common Pleas, Domestic Relations Division is affirmed. Pursuant to App.R. 24, James is hereby ordered to pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Christine E. Mayle, J.                              _____
                                                                 JUDGE

Gene A. Zmuda, J.

                                                          _____
Myron C. Duhart, P.J.                                  JUDGE
CONCUR.

                                                          _____
                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.